UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24 CR 411 |
| v. | ) | |
| | ) | Hon. Sunil R. Harjani |
| DAMARRI CONNER | ) | District Judge |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Carjackings are among the most personal and terrifying crimes committed in this District. The victims are unexpecting and innocent, and the perpetrators invade their private vehicles typically with guns and threats. Any carjacking is a serious, dangerous offense. Defendant's crime in this case, however, went well beyond a normal carjacking. On November 2, 2023, defendant Damarri Conner invaded a family's home. He accosted them in their backyard, punched the mother in the face, racked the slide on his gun and pointed it at the father, and threatened to kill them while he took their Audi. Defendant did all of that while the victims' 12-year-old daughter stood by petrified that her parents would be killed. This crime was heinous and violent. The trauma he inflicted on his victims will take years to repair.

But defendant did not stop with the November 2 carjacking. A few days later, he fled from police when they tried to stop him in the Audi. A few days after that, he had the audacity to go back to the victims' home and steal their other vehicle. Then, when he was arrested after fleeing from police again, he obstructed justice by trying to intimidate or hurt witnesses, including his own stepfather.

1

While defendant is young and his criminal history is more limited than his co-defendant, he was the more violent aggressor in this crime, and he continued to engage in dangerous behavior after the initial carjacking. His conduct shows a violent escalation in criminal behavior and requires a truly significant sentence to ensure he never does this again. No sentence will repair the pain defendant has inflicted upon his victims, but a sentence of 102 months, toward the top of the Guidelines range, to run consecutive to the mandatory minimum of 84 months, is just. The government recognizes 186 months is a significant sentence, but given defendant's extreme violence, his dangerousness, and the need to protect society and deter defendant from hurting people again, this sentence is warranted.

## I.   BACKGROUND

On September 4, 2024, defendant was charged in an indictment with carjacking, in violation of Title 18, United States Code, Section 2119, and using a gun in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c). Dkt. 1. On January 8, 2024, defendant pled guilty by declaration to both counts of the indictment. Dkt. 79. Defendant is scheduled to be sentenced by this Court on March 20, 2025. Dkt. 145.

## II.   ADVISORY GUIDELINES CALCULATION

Count Two requires a mandatory minimum sentence of 7 years because defendant brandished his firearm during the carjacking he committed.

As to Count One, the Probation Office has calculated defendant's pre-acceptance offense level as 31, based upon the carjacking, the injuries to the victims, his physical restraint of one of the victims, the value of the vehicle taken, and

2

defendant's obstruction and reckless endangerment during flight. PSR at ¶¶ 27-41. The government agrees with the Probation Office's offense level calculation. The government also agrees with the Probation Office's determination that defendant has a criminal history category of II. PSR ¶ 56. Defendant thus has a final offense level of 28, resulting in a sentencing guideline range of 87 to 108 months' incarceration, to run consecutive to the mandatory 84 months pursuant to Count Five. PSR ¶ 109. The Probation Office has recommended a total sentence of 156 months.

### III. THE 3553(A) FACTORS WARRANT A SIGNIFICANT SENTENCE WITHIN THE GUIDELINES RANGE

The Sentencing Guidelines provide an initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. The Guidelines thus "remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see also United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). The ultimate goals of the Guidelines are "uniformity and proportionality." *Rita v. United States*, 551 U.S. 338, 349 (2007). Put differently, a Guidelines sentence ensures that a defendant does not receive an unfairly high or low sentence simply based on the district in which he is sentenced or the judge who sentences him. In addition to the Guidelines, the court must consider the factors set forth in 18 U.S.C. § 3553(a).

Here, the Guidelines range fairly reflects defendant's criminal history, the extremely reckless and violent crime he committed, and the need to deter defendant and others from committing similar offenses. A Guidelines sentence is warranted, and given defendant's aggravating conduct, a sentence toward the top of the Guidelines range is justified.

### A. The Nature and Circumstances of the Offense

In November 2023, defendant made a plan to commit a violent carjacking in the Beverly neighborhood of Chicago. Defendant was prepared for crime. He was wearing all black, a hood, and a face mask. He had a loaded gun. Defendant and his co-defendant took the bus to Beverly, a residential neighborhood on Chicago's southwest side filled with apartments and single-family homes, many of which have long driveways leading to residential backyards.

At about 8:45 p.m., defendant and his co-defendant identified their target. They hid near a home with a long driveway and watched as Victim A and her 12-year-old daughter pulled into their driveway in a Range Rover and parked in the garage in the backyard of their home. Victim A and her daughter were returning from volleyball practice. Victim B, the father and husband, was inside their home. After Victim A parked the car, her daughter got out and walked to the home, carrying her volleyball gear. Then, Victim A got out of the car and started walking toward the back door of her home.

The defendants then sprung from their hiding place and attacked Victim A. The entire carjacking was captured on surveillance camera. The government intends

4

to present this video as an exhibit at sentencing, and it was included in the government's version of the offense. Defendant's violence, as captured on the video, shows a complete disregard for human life. This callous violence is aggravating.

First, Merritt ran up to Victim A and threw her to the ground. He violently ripped her pursue from her shoulder. As Victim A scrambled on the ground and screamed in terror, defendant ran up to her with a gun in his right hand. With his left hand, he punched Victim A in the face, causing her to collapse on the ground. Below is a screen shot of Victim A's head snapping back to the ground after defendant punched her while holding a gun in his right hand:



Defendant then pointed the gun at Victim A from point blank range as she cowered in fear. Both defendants yelled at her in attempt to get the keys to the car and desperately attempted to appease them. Below is a screenshot of defendant pointing the gun at Victim A while she attempts to block her face from getting shot:



Seconds later, Victim B, Victim A's husband, came out to try and help her. He yelled at defendants to stop. But they did not stop. Instead, defendant turned toward Victim B, racked the slide of his gun, and pointed it right at Victim B. Thankfully, Victim B did not have a legal gun, and the carjacking did not devolve into a shootout, but defendant's actions show he was prepared to shoot and kill if necessary. Below is a screenshot of defendant pointing the gun at Victim B as they approached him.



Victim B came down from the porch and tried to appease the defendants by

helping them get his cars. Victim B was calm. He did not want to fight the defendants; he wanted to protect his family and get the carjackers away from his home. But, despite Victim B's composure, the carjackers vicious threats and violent behavior continued. Defendant moved Victim B by force and at gunpoint over to the family's two vehicles. As Victim B desperately tried to explain to the carjackers how to start the car, the carjackers forced both victims to the ground, and yelled threats like "you got three seconds, shoot her," and "shoot her if she moves." Eventually, the carjackers figured out how to start the victims' Audi and drove off.

Defendant's crime was heinous and violent, but his dangerous conduct did not end that night. On November 8, 2023, a few days after the carjacking, Chicago Police Department ("CPD") officers tried to stop defendant while he was driving the Audi. Instead of stopping, he led the officers on a high-speed chase with a female passenger in the front seat. CPD officers later found and interviewed the female passenger, referred to in the PSR as Individual A. She told officers that defendant was driving the car and that when he saw officers, he told her he was going to lead them on a "high-speed." Like with the carjacking, defendant's dangerous behavior was premeditated and incredibly reckless.

His alarming conduct did not stop there. Defendant had stolen the keys to the victims' other car, a Range Rover, during the carjacking. On November 14, defendant, having lost the Audi when police recovered it and undeterred by news coverage about the violent carjacking he committed, went back to the victims' home and used those keys to brazenly steal the Range Rover from in front of their house. This second crime

7

re-traumatized his victims. It also led to him getting caught.

Law enforcement was able to track the Range Rover to defendant's neighborhood and located defendant in a different vehicle. Defendant fled from the vehicle and was found hiding in the closet of a residential home. A gun was later recovered in the vehicle. Law enforcement also searched defendant's home that day. After finding clothing matching the carjackers' clothing, they showed defendant's stepfather a picture of defendant at a gas station after the carjacking. His stepfather confirmed that it was defendant in the picture but did not know anything about the carjacking.

After defendant's arrest, he was unrepentant. He showed no remorse and instead continued to engage in dangerous conduct that easily could have resulted in someone getting hurt. While detained at Cook County Jail, defendant spoke to Individual B on a recorded call. Individual B told defendant that his father may have implicated and said that he saw defendant's father and "was going to hop out and blaze him." Individual B then asked for permission to shoot or hurt defendant's father, and defendant responded, "No go ahead, I give you all rights. Go ahead, go ahead. All rights, all rights." Put simply, defendant effectively ordered a hit on his own stepfather.

Individual B then mentioned Individual A, the female passenger in the Audi with him when he fled from police. Defendant indicated that she had "snitched" and told Individual B where Individual A lived, again putting a witness in danger.

Defendant then tried to fabricate an alibi, instructing Individual B, "You all can do my alibis. You all can say I was on Merrion the whole time."

Defendant committed a horrible, violent crime. It is a miracle that no one was hurt or killed because of his actions. Victims A and B easily could have been shot. Police or bystanders could have been hurt during the high-speed chase. His stepfather, who has since passed away from natural causes, could have been killed for merely identifying defendant in a picture. Each of defendant's actions showed a callous disregard for human life.

Sadly, the impact of defendant's crimes on his victims will last long after he is sentenced. Any carjacking is uniquely personal—an invasion of someone's private vehicle. But here, defendant invaded his victims' home, the most sacred place for any family. He physically injured his victims, but he also traumatized them, leaving psychological scars that have yet to heal. As detailed in the PSR, Victim B was terrified. He believed he was going to die that night. His wife, Victim A, has not recovered. Three years later, she suffers from nightmares and has not been able to sleep in the same bed as Victim A due to her trauma. As he put, she is a "different person now." Defendant's actions changed Victim A forever.

The victims' daughter is also forever changed. She was only 12 years old when she saw her mother thrown to the ground and punched and saw a gun pointed at her parents. This happened in her own backyard, a place she has to walk through every day. Victim B described a recent incident when they were at a Halloween festival

9

because costumed actors triggered memories of the carjacking and caused his daughter to freeze up and leave her friends.

In sum, defendant's action will reverberate for years. He has forever scarred the victims' family. Defendant's punishment must reflect the grave seriousness of his crimes, the trauma he inflicted upon several innocent people, and the danger and violence he caused. A high-end Guidelines sentence, in addition to the mandatory minimum sentence, is appropriate given the scope and seriousness of his crimes.

### B. Defendant's History and Characteristics

Defendant is 23 years old and has lived in the Chicago area for his whole life. PSR ¶¶ 65-67. While defendant's father died in a car accident when he was young, he had a stable childhood. His mother was employed, had no criminal history, and did not abuse substances. PSR ¶¶ 66-67. She was in a relationship with his stepfather, who owned two businesses and had a good relationship with defendant. PSR ¶ 68. His siblings and girlfriend are all employed and have not had issues with the law. PSR ¶¶ 69-70. Defendant graduated high school and has held a few jobs in his young life. PSR ¶¶ 94-99.

Twice in the months just before he committed these carjackings defendant was shot in separate incidents. PSR ¶¶ 79-80. Nevertheless, despite being the victim of gun violence and despite having a supportive family, defendant chose to re-inflict that trauma on others during this carjacking. While he is young, his criminal history shows an escalating disregard for the law and penchant for violent behavior. In 2021, at the age of 18, he threatened to shoot officers at Midway Airport and got into a fight with officers, injuring them. PSR ¶ 52. Only six months after being convicted of that

crime, defendant committed a battery when he beat a security guard at his job at UPS. PSR ¶ 53. A few months after that, defendant got into another altercation with police at a CTA station and was convicted of theft. PSR ¶ 54. Aside from those cases, defendant also has a pending gun case where the facts indicate he fled from police and had a gun. PSR ¶ 58.

Defendant is a young man, and he has not spent any significant time in jail. These facts are mitigating. Yet, it is also aggravating that despite a supportive family, defendant turned away from a productive life and toward criminal behavior and consistent disregard of the law. It is also troubling that he so quickly graduated to this extremely violent crime. Defendant's youth should offer some mitigation, but it does not warrant a departure from the Guidelines range. It is important that the sentence be sufficiently significant to ensure that defendant never commits such a violent crime again.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence

Defendant's crime terrorized innocent Chicagoans and showed a complete disregard for human life, for societal norms, and for the law. A sentence toward the top of the Guidelines range will appropriately punish him for the harm he has caused, it will provide some measure of justice for those he victimized, and it will deter him from continuing to offend.

General deterrence is also a factor in this case. While the murder rate in Chicago has thankfully declined in recent years, carjackings, many committed by

11

unrepentant carjackers like defendant, have spiked, doubling from 2018 to 2023.[1] These violent carjackings are committed by a relatively small number of people, but they have a huge impact on the citizens of the Northern District as a whole. As reflected in the statement from the victim, these crimes cause significant trauma, and they are uniquely personal. Carjackings like those here not only leave the victims scarred, but they impact the sense of safety and security for all Chicagoans. Robberies scare away businesses and ruin neighborhoods. Indeed, Victim A reported several families moving away from his neighborhood in the months after this carjacking. Minimal sentences simply do not deter those who would commit such dangerous crimes. Only a Guidelines sentence will deter defendant and others like him who would terrorize innocent Chicagoans without remorse.

## IV.     RECOMMENDED CONDITIONS OF SUPERVISED RELEASE

Given the circumstances of the offense and all the factors set forth in Title 18, United States Code, Section 3553(a), the government recommends that the Court impose the maximum period of supervised release of five years.

The mandatory, discretionary, and special conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on pages 25 through 30 of the PSR. The government agrees with the conditions proposed in the PSR and concurs with the probation officer's rationale for these conditions. Specifically, the government agrees that discretionary conditions (4), (6), (8), and special conditions (3) and (13) promote

---

[1] *See* Illinois Policy Institute, *Carjackings More Than Double from 5 Years Ago*, December 5, 2023, *available at* https://www.illinoispolicy.org/carjackings-more-than-double-in-chicago-from-5-years-ago/.

the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon his release. Providing defendant with adequate educational and job training will help him achieve employment, which will be crucial in helping prevent recidivism. The government further agrees that discretionary conditions (7), (9), (14), (15), (16), (22), and (23) and special conditions (5), (6), (7), and (11) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed.

## V.  CONCLUSION

Defendant committed an incredibly violent carjacking that traumatized his victims. For the reasons set forth above, the government respectfully requests that this Court impose a sentence of 186 months.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:  s/ Elie Zenner
ELIE ZENNER
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 697-4032